United States Courts
Southern District of Texas
F I L E D

SEP 12 2019

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | **Criminal No.** 19-683 |
| | § | **UNDER SEAL** |
| JOHN ANDREW SIMS (1), | § | |
| a/k/a DREW SIMS; | § | |
| ASHLEY MORRONICA MCCAIN (2), | § | |
| a/k/a ASHLEY SIMS; | § | |
| WILBERT EARL OLIVER (3); | § | |
| GREGORY COMIER (4), | § | |
| a/k/a "DUNK"; | § | |
| KESIA KASHA BANKS (5), | § | |
| a/k/a "KEKE"; | § | |
| HORACE JOSEPH LEBLANC (6); | § | |
| JACQUELINE MARIE HILL (7), | § | |
| a/k/a "JACKIE," | § | |
| | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to the Indictment, unless otherwise specified:

1.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly and intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.     The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse,

likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to Schedule II meant that the drug had a high potential for abuse, potentially leading to severe psychological or physical dependence, and the drug had a currently accepted medical use in treatment in the United States or the drug had a currently accepted medical use with severe restrictions. A controlled substance assigned to Schedule IV meant the drug had a lower potential for abuse and a lower risk of dependence, and the drug had a currently accepted medical use for treatment in the United States.

4. Pursuant to the CSA and its implementing regulations:

a. Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(xiii). Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

b. At all times relevant, and as of October 6, 2014, hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(vi). Prior to October 6, 2014, hydrocodone was classified as a Schedule III controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

c. Carisoprodol, was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommended carisoprodol only for acute treatment for two to three weeks at a time.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone and carisoprodol significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused

2

and sought for a non-legitimate medical purpose due to the increased "high" a user may experience from taking hydrocodone or oxycodone along with carisoprodol.

6. Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7. Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe or distribute controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.    All prescriptions for controlled substances must be "dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II is prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

10.    The Texas Administrative Code Section 195.2 required a pain management clinic to obtain a certificate from the Texas Medical Board. The Texas Administrative Code Section 195.1 defined a pain management clinic as a "publicly or privately owned facility for which a majority of patients are issued, on a monthly basis, a prescription for opioids, benzodiazepines, barbiturates, or carisoprodol, but not including suboxone." Texas codified Minimum Requirements for the Treatment of Chronic Pain in Section 170.3 of the Texas Administrative Code.

11.    The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). Pharmacies were required to report to the PMP all controlled substances dispensed, including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

4

12. A "crew leader" was someone who often found and often paid individuals, some of whom were homeless or impoverished, to pose as chronic pain patients; often transported them (often in groups) to a clinic; often coached them to fill out patient intake documentation to support a prescription for pain medication and paid for the "visit with the doctor" (i.e., the illegitimate prescription); often took the patient (or just the illegitimate prescription) to the pharmacy; and often paid for and took control of the prescription drugs, many times to divert and sell them on the street for profit.

13. A "runner" was an individual who often worked for a crew leader and "ran" or coordinated taking the individuals posing as patients to clinics and pharmacies to obtain controlled substances. A runner often transported the patients to the clinics or pharmacies for the crew leader, and often paid the patients, clinics, and pharmacies on the behalf of the crew leader.

## ENTITIES, DEFENDANTS, AND RELATED INDIVIDUALS

14. Continuous Medical Care and Rehabilitation, also known as Continuous Medical Care and Wellness Center ("Continuous"), was an unregistered pain management clinic. Continuous was located at 7227 Fannin Street, Suite 101, Houston Texas, 77030 until in or around May 2017, when it relocated to 5600 S. Willow Drive, Suite 201, Houston, Texas 77035, and then to 8313 Southwest Freeway, Suite 240, Houston, Texas in or around June 2017. In or around October 2017, Continuous again relocated to 1135 Edgebrook Drive, Houston, Texas 77034, where it remained until in or around January 2019.

15. **JOHN ANDREW SIMS** ("**JOHN SIMS**"), also known as "Drew," a resident of Katy, Texas, owned and controlled Continuous with his wife **ASHLEY MCCAIN**.

16. **ASHLEY MORRONICA MCCAIN** ("**ASHLEY MCCAIN**"), also known as Ashley McCain Sims, a resident of Katy, Texas, owned and controlled Continuous with her husband **JOHN SIMS**.

17. **WILBERT EARL OLIVER** ("**WILBERT OLIVER**"), a resident of Houston, Texas, brought individuals to Continuous to pose as patients to obtain illegitimate prescriptions for controlled substances that were often diverted for profit.

18. **GREGORY COMIER**, also known as "Dunk," a resident of Houston, Texas, brought individuals to Continuous to pose as patients to obtain illegitimate prescriptions for controlled substances that were often diverted for profit.

19. **KESIA KASHA BANKS** ("**KESIA BANKS**"), also known as "Keke," a resident of Houston, Texas, brought individuals to Continuous to pose as patients to obtain illegitimate prescriptions for controlled substances that were often diverted for profit.

20. **HORACE JOSEPH LEBLANC** ("**HORACE LEBLANC**"), a resident of Houston, Texas, brought individuals to Continuous to pose as patients to obtain illegitimate prescriptions for controlled substances that were often diverted for profit.

21. **JACQUELINE MARIE HILL** ("**JACQUELINE HILL**"), also known as "Jackie," a resident of Houston, Texas, brought individuals to Continuous to pose as patients to obtain illegitimate prescriptions for controlled substances that were often diverted for profit.

22. Physician 1, a resident of Sugarland, Texas, was a medical doctor licensed to practice medicine in the State of Texas. In or around February 2017, Physician 1 began working

at Continuous, where he unlawfully prescribed controlled substances, primarily oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg.

## COUNT 1
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

23.     Paragraphs 1 through 22 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

24.     From in or around early 2017 through in or around early 2019, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**JOHN SIMS,**
**ASHLEY MCCAIN,**
**WILBERT OLIVER,**
**GREGORY COMIER,**
**KESIA BANKS,**
**HORACE LEBLANC,** and
**JACQUELINE HILL**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other controlled substances, outside the usual course of professional practice and not for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## Purpose of the Conspiracy

25.     It was a purpose and object of the conspiracy for Defendants and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

## Manner and Means of the Conspiracy

The manner and means by which Defendants sought to accomplish the purpose and object of the conspiracy included, among other things:

26.     **JOHN SIMS** and **ASHLEY MCCAIN** owned and controlled Continuous, a purported medical clinic that operated as a "pill mill." Although **JOHN SIMS** owned and controlled Continuous, the business was in **ASHLEY MCCAIN**'s name, and **ASHLEY MCCAIN** managed Continuous's daily operations beginning in or around October 2017.

27.     **ASHLEY MCCAIN** hired Physician 1 in or around early 2017 to work at Continuous and prescribe controlled substances. Physician 1 maintained a DEA registration number and an active medical license in the State of Texas, which he used to prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, outside the usual course of professional practice and not for a legitimate medical purpose.

28.     Crew leaders and runners, including **WILBERT OLIVER, GREGORY COMIER, KESIA BANKS, HORACE LEBLANC,** and **JACQUELINE HILL,** regularly

paid—or an employee at Continuous paid, on behalf of the crew leaders and runners—individuals to pose as patients at Continuous to obtain prescriptions for controlled substances.

29. Crew leaders and runners, including **WILBERT OLIVER, GREGORY COMIER, KESIA BANKS, HORACE LEBLANC,** and **JACQUELINE HILL,** often coordinated bringing these "patients" to Continuous in advance with **JOHN SIMS, ASHLEY MCCAIN,** and others at Continuous to ensure they would receive a prescription for controlled substances.

30. Continuous accepted cash only, ranging from $275 to $300 for a prescription for hydrocodone, prescribed under the brand name Norco, and carisoprodol, prescribed under the brand name Soma; to approximately $500 for a prescription for oxycodone and carisoprodol (Soma). Crew leaders and runners, including **WILBERT OLIVER, GREGORY COMIER, KESIA BANKS, HORACE LEBLANC,** and **JACQUELINE HILL,** usually paid Continuous either directly or through the individuals posing as patients.

31. Almost every "patient" who visited Continuous received a nearly identical prescription for controlled substances purportedly prescribed by Physician 1: either 120 pills of hydrocodone (Norco) 10/325mg or 120 pills of oxycodone 30mg, along with 90 pills of carisoprodol (Soma) 350mg—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone.

32. **JOHN SIMS** and **ASHLEY MCCAIN** collected cash from Continuous, and deposited hundreds of thousands of dollars of cash proceeds into bank accounts they owned or controlled, many of which were held in the name of various Texas limited liability corporations.

33. Between in or around March 2017 and in or around January 2019, Physician 1 prescribed at Continuous over 2,344,000 controlled-substance pills of oxycodone 30mg,

hydrocodone 10/325mg, and carisoprodol 350mg, including over 624,000 pills of oxycodone 30mg, over 774,000 pills of hydrocodone 10/325mg, and over 945,000 pills of carisoprodol 350mg—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone—the vast majority of which were not for a legitimate medical purpose and outside the usual course of professional practice.

34.     **JOHN SIMS** and **ASHLEY MCCAIN** knew that crew leaders and runners, including **WILBERT OLIVER, GREGORY COMIER, KESIA BANKS, HORACE LEBLANC**, and **JACQUELINE HILL**, and others often diverted these pills for profit.

All in violation of Title 21, United States Code, Section 846.

## COUNTS 2–6
**Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting
(21 U.S.C. § 841 & 18 U.S.C. § 2)**

35.     Paragraphs 1 through 22 and 26 through 34 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

36.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendants specified below, aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substances alleged below, outside the usual course of professional practice and not for a legitimate medical purpose:

| Count | Defendants | Controlled Substance(s) | Date | "Patient" |
|---|---|---|---|---|
| 2 | **JOHN SIMS ASHLEY MCCAIN WILBERT OLIVER GREGORY COMIER** | Norco and Soma | March 8, 2018 | A.H. |
| 3 | **JOHN SIMS ASHLEY MCCAIN WILBERT OLIVER GREGORY COMIER** | Norco and Soma | March 8, 2018 | S.L. |

10

| | | | | |
|---|---|---|---|---|
| 4 | **JOHN SIMS**<br>**ASHLEY MCCAIN**<br>**HORACE LEBLANC** | Norco and Soma | February 12, 2018 | K.S. |
| 5 | **JOHN SIMS**<br>**ASHLEY MCCAIN**<br>**JACQUELINE HILL** | Oxycodone and Soma | September 12, 2018 | M.D. |
| 6 | **JOHN SIMS**<br>**ASHLEY MCCAIN**<br>**KESIA BANKS** | Oxycodone | October 29, 2018 | J.S. |

All in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), (b)(2) & Title 18, United States Code, Section 2.

## COUNT 7
**Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity**
**(18 U.S.C. § 1957 & 18 U.S.C. § 2)**

37. Paragraphs 1 through 22 and 26 through 34 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

38. On or about January 7, 2019, in the Houston Division of the Southern District of Texas, and elsewhere, Defendant

**JOHN SIMS**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Distribute and Dispense Controlled Substances, in violation of Title 21, United States Code, Section 846, as follows:

| Bank Account | Account Owner | Signatory | Payee | Amount | Description |
|---|---|---|---|---|---|
| BBVA Compass *0218 | Greatway Interest and Investment Inc. | JOHN SIMS | Apache Group Commodities | $101,800 | Wire transfer to Apache Group Commodities account re: shipment of frac tanks to Kenya |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853(a))

39.     Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**JOHN SIMS,
ASHLEY MCCAIN,
WILBERT OLIVER,
GREGORY COMIER,
KESIA BANKS,
HORACE LEBLANC,** and
**JACQUELINE HILL**

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the following is subject to forfeiture:

a.      all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

b.      all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(1))

40.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to Defendant

**JOHN SIMS**

that upon his conviction of an offense in violation of Title 18, United States Code, Section 1957, any property, real or personal, involved in such money laundering offense, and any property traceable to such property, is subject to forfeiture.

## PROPERTY SUBJECT TO FORFEITURE

41.     Defendants are further notified that the property subject to forfeiture includes, but is not limited to, the following:

a.     $413,226.25 in U.S. Currency;

b.     2010 Mercedes-Benz S65 AMG, VIN: WDDNG7KB2AA338316;

c.     $2,136.29 seized from BBVA Compass Bank checking account *7062;

d.     $9,665.21 seized from BBVA Compass Bank savings account *9987;

e.     $5,224.28 seized from BBVA Compass Bank checking account *9754;

f.     $4,764.50 seized from BBVA Compass Bank checking account *8960;

g.     $3,559.05 seized from BBVA Compass Bank checking account *4014;

h.     $22,135.94 seized from BBVA Compass Bank checking account *0218;

i.     $12,911.51 seized from BBVA Compass Bank savings account *0658; and

j.     Assorted seized jewelry (valued at approximately $14,900.00).

### Money Judgment and Substitute Assets

42.     The United States will seek the imposition of a money judgment against each Defendant upon conviction.

(continued on next page)

43. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each Defendant up to the amount of the money judgment against that Defendant.

A TRUE BILL

Original Signature on File

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING DEPUTY CHIEF, HEALTH CARE FRAUD UNIT
U.S. DEPARTMENT OF JUSTICE

ALEZA REMIS
ASSISTANT DEPUTY CHIEF
DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE